UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| DIALYSIS NEWCO INC.; dba DSI LAREDO DIALYSIS; cp DIALYSIS HOLDCO LLC, | § § § § | |
| Plaintiff | § | |
| VS. | § | CIVIL ACTION NO. 5:15-CV-272 |
| | § | |
| COMMUNITY HEALTH SYSTEMS TRUST HEALTH PLAN; aka COMMUNITY HEALTH SYSTEMS GROUP HEALTH PLAN, *et al.*, | § § § § § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

This action arises under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461. Plaintiff DSI Newco (DSI) seeks reimbursement from Defendant Community Health Systems Trust Health Plan (CHS Plan) for dialysis treatments provided to one of the CHS Plan's participants. All Parties have filed Motions for Summary Judgment. At bottom, the Court must decide if Defendants Community Health Systems (CHS) and MedPartners Administrative Services (MedPartners) abused their discretion when they denied DSI's benefits claims under the CHS Plan.

The abuse-of-discretion question turns on whether Defendants interpreted the CHS Plan's Usual and Customary Charge (UCR) provision incorrectly. To reach this core question, however, the Court must first address several procedural hurdles, namely: (1) whether all Defendants are proper party defendants to this case, (2) whether the CHS Plan's anti-assignment clause deprives DSI of standing,

and (3) whether DSI exhausted its administrative remedies.

After careful review, the Court resolves all procedural issues in favor of DSI, holds that Defendants abused their discretion, and **REMANDS** DSI's claims to CHS for further factual determinations. Thus, the Court **GRANTS IN PART AND DENIES IN PART** DSI's Motion for Summary Judgment (Dkt. No. 61) and **DENIES** CHS's and MedPartners's Motions for Summary Judgment (Dkt. Nos. 73, 77, 78).

Finally, all Motions (Dkt. Nos. 70, 73, 80, 84, 89, 92, 103) dealing with filing additional pages, supplementing the record, or filing sur-replies in regards to the Summary Judgment Motions are **GRANTED**. All other pending Motions (Dkt. Nos. 81, 97) are **DENIED**.

## I. BACKGROUND

In 2012, Patient H.S. was diagnosed with end stage renal disease. H.S. was employed by CHS, one of the largest hospital operators in the country, and participated in the CHS Plan, an employer-sponsored group healthcare plan governed by ERISA. To combat his disease, H.S. began receiving dialysis treatment from DSI, a free-standing dialysis facility in Laredo, Texas. On his first day of treatment, H.S. executed a document entitled "Assignment of Benefits." This document gave DSI the ability to submit claims on H.S.'s behalf and authorized the CHS Plan to pay DSI directly for the dialysis treatments. (Dkt. No. 65-13 at 27). The treatment lasted from September 13, 2012, through November 30, 2013. (Dkt. No. 105 at 6–8).

The CHS Plan designates CHS as the plan sponsor and administrator, but it allows CHS to contract with third-party administrators (TPA) to help in the claims process. (Dkt. No. 75 at 61). Using that authority, CHS enlisted MedPartners as a TPA to "provide certain administrative services." (Dkt. No. 77-2 at 2). MedPartners, in turn, subcontracted with Global Excel to assist it in administering claims. (Dkt. No. 42 at 3). MedPartners's and Global Excel's responsibilities included determining if the CHS Plan covered a participant's medical-benefits claims[1] and handling first-level appeals for participants who were unhappy with the initial decision. (Dkt. Nos. 75 at 40; 75-4 at 81–82, 84). CHS, however, retained authority to review second-level appeals and all "final discretionary authority" to determine whether participants are entitled to benefits. (Dkt. No. 75 at 40-41).

For the first three months of H.S.'s dialysis treatments, the CHS Plan paid 100% of DSI's billings. (Dkt. No. 75-2 at 3–27). But after this point, MedPartners and Global Excel changed course. They determined that the UCR for the following 141 treatments was only a fraction of what DSI charged. Of the $844,472.02 billed, the CHS Plan only paid $68,278.48, leaving an unpaid balance of $776,193.54. (Dkt. No. 105).

In the notice-of-benefit-denial letters, MedPartners explained its decision to remit the charges. The letters begin by citing the CHS Plan's UCR provision, which states:

---

[1] As shown by the notices-of-benefit-denial letters on DSI's claims. (Dkt. No. 75-3 at 3–87).

> *Usual Charge* means the amount ordinarily charged by a Provider for any given service, and *Customary Charge* means a charge that falls within the range of the Usual Charges for any given service within the geographical area in which the service is rendered.

(Dkt. No. 75-3 at 3). The letters then consider many different factors not mentioned in the UCR definition. (*Id.*). And they conclude by proclaiming that the UCR for dialysis treatments is 200% of the Medicare rate. (*Id.* at 4). In MedPartners's opinion, anything over that amount was excessive. The letters stated no other reasons for denying DSI's claims.

DSI filed two separate first-level appeals for these decisions and one second-level appeal. On June 12, 2013, DSI submitted the first appeal requesting the reprocessing of the claims with dates of service from December 4, 2012, through May 25, 2013. (Dkt. No. 75-4 at 34–79). On January 23, 2014, it sent the second first-level appeal contesting the underpayment of all 141 disputed claims. (Dkt. No. 85 at 10). Global Excel, with MedPartners's approval, denied both appeals, doubling down on its Medicare-rate theory. (Dkt. No. 75-4 at 81–82, 84). Then, on March 12, 2014, DSI mailed a second-level appeal directly to CHS in accordance with the CHS Plan's review procedures. (Dkt. No. 75-4 at 91–92). Despite being aware of the appeal, CHS never acted on it. (*Id.* at 88–90).

Believing its administrative remedies exhausted, DSI had H.S. assign the right to pursue any legal claims stemming from the dialysis treatments to DSI. (Dkt. No. 65-13 at 28). Four days later, DSI filed this lawsuit under ERISA, 29 U.S.C. § 1132(a)(1)(B), seeking to reclaim the unpaid benefits totaling $776,193.54. (Dkt. No. 1).

4

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the moving party has shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009). The dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All evidence is viewed in the light most favorable to the non-movant. *Miller v. Metrocare Servs.*, 809 F.3d 827, 832 (5th Cir. 2016).

The initial burden is on the movant to point to portions of the record which he believes demonstrate the absence of a genuine dispute about a material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met his initial burden, the burden then shifts to the non-movant to come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted). When the movant would not bear the burden of proof at trial on a particular claim, he meets his initial burden on summary judgment if he identifies an element of the claim for which the non-movant has produced no evidence. *See Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir. 1992).

## III. Analysis

### A. Procedural Issues

Before the Court can delve into whether Defendants abused their discretion, it must navigate through several procedural issues, namely: (1) whether all Defendants are proper party defendants, (2) whether DSI has standing to bring this lawsuit, and (3) whether DSI exhausted its administrative remedies.

#### 1. Proper Party Defendants

DSI bases this lawsuit on 29 U.S.C. § 1132(a)(1)(B), which allows a plan participant "to recover benefits due to him under the terms of his [ERISA] plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Since this language does not limit the potential scope of defendants to the ERISA plan itself, other entities may be proper party defendants in a § 1132(a)(1)(B) action. The only requirement is that they have actual control over the benefits-claims process.

The actual-control test springs from *LifeCare Mgmt. Servs. L.L.C. v. Ins. Mgmt. Admins. Inc.*, 703 F.3d 835, 844 (5th Cir. 2013), where the Fifth Circuit had to decide whether a TPA could be a proper party defendant in an ERISA action. There, the court held that "'[t]he proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan' and that '[i]f an entity or person other than the named plan administrator takes on the responsibilities of the administrator, that entity may also be liable for benefits.'" *Id.* at 845 (alteration in original) (quoting *Gomez–Gonzalez v. Rural Opportunities, Inc.*,

626 F.3d 654, 665 (1st Cir. 2010)). Applying this newly adopted test, the court found that the TPA in *LifeCare* had actual control because of its authority to process claims, interpret the plan, and determine which claims were so routine that they should not be referred to the plan administrator for further review. *Id.* at 845. These tasks ventured far into the realm of discretionary, not ministerial, functions. *Id.*

Based on *LifeCare*, DSI argues that both MedPartners and CHS are proper party defendants in this case. Unsurprisingly, MedPartners and CHS point to each other as the culprit. MedPartners argues that it only played a ministerial role in the claims process. On its account, final authority to deny DSI's claims remained with CHS. CHS, on the other hand, points out that it played no role in denying DSI's claims. Rather, it delegated authority to MedPartners to administer the CHS Plan and to determine if DSI was entitled to payment.

Turning first to MedPartners, the Court holds that it is a proper party defendant to this lawsuit. MedPartners, with Global Excel's help, interpreted the CHS Plan and denied DSI's claims as well as its initial appeals. There is no evidence that CHS was involved in these decisions. Just as in *LifeCare,* these tasks are discretionary, not ministerial, in nature and demonstrate that MedPartners had actual control over administering and denying DSI's claims.

MedPartners opposes this conclusion, emphasizing that it cannot have actual control over the claims process because it did not have final authority over them. The CHS Plan states that CHS has "sole, exclusive, and final discretionary

7

authority to determine" claims and that CHS will conduct a final, second-level review. (Dkt. No. 75 at 40–41). For support, MedPartners cites to *Center for Restorative Breast Surgery, L.L.C. v. Humana Health Ben. Plan*, No. CIV. A. 10-4346, 2015 WL 4394034 (E.D. La. July 15, 2015). In *Humana*, the ERISA plan instructed claimants to submit all second-level appeals directly to the plan administrator, not the TPA. The court contrasted this arrangement with *LifeCare* where the TPA made the final decisions on routine claims and only sent the non-routine claims to the plan administrator for another review. *Id.* at *13. Because of this difference, the district court found that the TPA did not have actual control.

The Court is unmoved by MedPartners's argument. It is true that the CHS Plan grants final authority to CHS and that claimants have the discretion to file a second-level appeal directly with CHS. But *LifeCare* did not craft a final-authority test—it crafted an actual-control test. And it is certainly possible, as here, for a TPA lacking final authority to still have actual control over the claims process. MedPartners cannot use its lack-of-final-authority argument as a shield when it took such extensive and discretionary actions in denying DSI's claims.

The Court acknowledges that this conclusion conflicts with *Humana* but believes that *Humana* interpreted *LifeCare* too restrictively. In *Humana*, the court relied on the examples listed in *LifeCare* for when a TPA *might* not be liable. This list of examples included cases where a TPA refers all claims to the plan administrator for final review. *See Humana* at *13 (citing *LifeCare*, 703 F.3d at 845–56). These situations, however, are dicta as none of them were at issue in

8

*LifeCare.* As dicta, they should not be interpreted to conflict with the test actually adopted in *LifeCare*, a test that focuses on actual control, not just final authority. The better interpretation of *LifeCare* accepts the actual-control test for what the Fifth Circuit said it was: a functional test that can be proven in many different ways, one of which is having final authority. But while final authority may be a sufficient condition for finding actual control, *LifeCare*'s holding makes clear that it is not a necessary condition.

At the same time, CHS is also a proper party defendant in this case. As stated above, CHS retained final authority over claims if a claimant sought a second-level review. As it happens, DSI did submit a second-level appeal to CHS, yet despite being aware of it, CHS never responded. (Dkt. No. 75-4 at 88, 91–92). CHS's silence flies in the face of the CHS Plan, which requires it to respond within 30 days. (Dkt. No. 75 at 40). By submitting the appeal, DSI gave CHS actual control over its claims' fates. CHS's dereliction of duty does not change that fact. Thus, CHS is also a proper-party defendant.

Finally, it is not contradictory to hold that both MedPartners and CHS had actual control over DSI's claims. In *LifeCare*, the court stated that if a TPA has actual control, it "*may* also be liable for benefits." 703 F.3d at 845 (emphasis added). This implies that both a plan administrator and a TPA can be proper party defendants. Indeed, both were found to be so in *LifeCare*.

### 2. DSI's Derivative Standing

ERISA confers standing to sue for benefits recovery under a plan on

9

participants and beneficiaries. 29 U.S.C. § 1132(a). It provides no independent right for a provider, such as DSI, to seek redress under ERISA. To have standing, then, providers must have a valid assignment of a participant's or beneficiary's ERISA rights. *Dall. Cty. Hosp. Dist. v. Assocs.' Health & Welfare Plan*, 293 F.3d 282, 285 (5th Cir. 2002).

DSI believes that it has this derivative standing because H.S. executed an "Assignment of Benefits" form on his first day of treatment. (Dkt. No. 65-13 at 27–28). Defendants disagree. They note that this assignment only authorized direct payment to DSI—it says nothing about the right to sue. And even if it did assign the right to sue, they contend that it would be worthless because the CHS Plan bars all assignments. The Court will address each argument in turn.

### a) Valid Assignment of the Right to Sue under ERISA

The September 13 assignment states that H.S. "request[s] that payment of authorized benefits be paid to DSI LAREDO and/or its agents." (*Id.* at 27). This language does not, as CHS observes, directly assign H.S.'s right to file suit for unpaid benefits under ERISA. But this is a distinction without a difference. In this circuit, the right to receive direct payment necessarily includes the right to sue for non-payment.

The *Hermann* cases make this proposition clear. In *Hermann Hospital v. MEBA Medical and Benefits Plan* (*Hermann I*), the Fifth Circuit found that a provider with a valid assignment of plan benefits can have derivative standing to bring suit under ERISA. 845 F.2d 1286, 1290 (5th Cir. 1998) *overruled in part on*

10

*other grounds by Access Mediquip, L.L.C. v. UnitedHealthcare Ins.*, 698 F.3d 229, 230 (5th Cir. 2012). The court, however, remanded the case because it was unable to decipher from the record if Hermann had a valid assignment. *Id.* On a second appeal, the court described its holding in *Hermann I* as:

> We also held, however, that if Mrs. Nicholas had made a valid assignment to Hermann of her right to receive payments for benefits under the Plan, Hermann would have derivative standing as an assignee to sue MEBA.

*Hermann Hosp. v. MEBA Med. & Benefits Plan*, 959 F.2d 569, 572 (5th Cir. 1992) (*Hermann II*), *overruled in part on other grounds by Access Mediquip, L.L.C. v. UnitedHealthcare Ins. Co.*, 698 F.3d 229 (5th Cir. 2012). Several years later, the Fifth Circuit, applying *Hermann I* and *II*, held that an assignment included the right to sue under ERISA where it read, "I hereby assign payment of hospital benefits directly to [the provider] herein specified and otherwise payable to me . . . ." *Tango Transp. v. Healthcare Fin. Servs. L.L.C.*, 322 F.3d 888, 889 (5th Cir.2003).

 *Hermann I, II,* and *Tango* are consistent with a now broad consensus among the circuits that, "when a patient assigns payment of insurance benefits to a healthcare provider, that provider gains standing to sue for that payment under ERISA § 502(a)." *North Jersey Brain and Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 372 (3d Cir. 2015).[2] This consensus is guided by Congress's intent that ERISA

---

[2] *See also Brown v. BlueCross BlueShield, Inc.*, 827 F.3d 543, 547 (6th Cir. 2016) ("[T]he assignment of the right to payment is sufficient to confer derivative standing to bring suit for non-payment under ERISA."); *I.V. Servs. of Am. v. Inn Dev. & Mgmt.*, 182 F.3d 51, 54 n.3 (1st Cir. 1999) (holding that an assignment of only the right to payment "easily clear[ed]" the low hurdle of a colorable claim for derivative standing); *Misic v. Bldg. Serv. Emps. Health & Welfare Trust*, 789 F.2d 1374, 1378–79 (9th Cir. 1986) (per curiam) (holding that an assignment of patients' rights to

"protect . . . the interest of participants in employee benefit plans." 29 U.S.C. § 1001(b). As the Third Circuit eloquently pointed out, splitting the right to sue from the right to receive payment does not serve this intent:

> It does not seem that the interests of patients or the intentions of Congress would be furthered by drawing a distinction between a patient's assignment of her right to receive payment and the medical provider's ability to sue to enforce that right. The value of such assignments lies in the fact that providers, confident in their right to reimbursement and ability to enforce that right against insurers, can treat patients without demanding they prove their ability to pay up front. Patients increase their access to healthcare and transfer responsibility for litigating unpaid claims to the provider, which will ordinarily be better positioned to pursue those claims. These advantages would be lost if an assignment of payment of benefits did not implicitly confer standing to sue.

*North Jersey Brain*, 827 F.3d at 373–374 (internal citations omitted). In light of this case law, the Court finds that DSI has derivative standing based on the direct-payment assignment, which implicitly includes the right to sue for nonpayment.

### b) Anti-Assignment Clause

Defendants also contend that DSI does not have standing because the CHS Plan's anti-assignment clause voids DSI's assignment. In response, DSI insists that the anti-assignment clause does not defeat DSI's standing for three reasons: (1) Tennessee law, which governs the CHS Plan, prohibits anti-assignment clauses in insurance contracts; (2) the anti-assignment clause is ambiguous; and (3) CHS waived its right to enforce the clause. The Court finds DSI's first two arguments meritorious.

---

reimbursement gave a provider ERISA standing in their place).

### (1) Tennessee Law

The CHS Plan contains a choice-of-law provision that states "to the extent not preempted by ERISA, the Plan will be construed according to the laws of the State of Tennessee and all provisions hereof will be administered according to the laws of said state." (Dkt. No. 75 at 58). Therefore, the Court turns to Tennessee law to inform its construction.

Section 56-7-120(a)(1) of the Tennessee Code requires that insurance contracts providing for healthcare allow the beneficiary to assign the benefits to "healthcare provider[s] and such rights must be stated clearly in the policy." DSI believes that this Tennessee statute nullifies any language in the CHS Plan prohibiting assignments. For that to be true, three things are necessary: (1) the choice-of-law provision must be enforceable, (2) the statute must not be preempted by ERISA, and (3) it must apply to the CHS Plan.

### (a) Choice of Law Provision

In the ERISA context, federal common law choice-of-law principles resolve residual choice-of-law issues. *Jimenez v. Sun Life Assurance Co.*, 486 F. App'x 398, 407 (5th Cir. 2012) (per curiam). While the Fifth Circuit has not yet adopted an explicit approach for deciding residual choice-of-law disputes in ERISA plans,[3] it

---

[3] The court stated that there are three possible approaches: (1) a court should assume that the choice-of-law provision should be followed unless unreasonable or fundamentally unfair; (2) a court should follow the Restatement (Second) of Conflict of Laws approach, which states that a choice-of-law provision should control unless the state picked has no substantial relationship to the parties or is contrary to the fundamental policy of the state that would have its laws apply in the clause's absence; or (3) a court should presumptively enforce a valid choice-of-law provision unless the party seeking to avoid the clause clearly shows that it is unreasonable under the circumstances. *Jimenez*, 486 F. App'x at 407–08.

has said that the party opposing the clause bears the burden of proving that it should not be enforced. *Id.* at 408. In *Jimenez*, the policy contained a choice-of-law provision applying Texas law, but the plaintiff sought to apply Louisiana law. The plaintiff was a Louisiana citizen, the accident occurred in Louisiana, and Louisiana was the forum state. Despite these contacts, the court enforced the choice-of-law provision because the plaintiff did not cite any legal authority "to support [the] claim that a difference between Texas and Louisiana law is sufficient to void the Policy's choice of law provision." *Id.* at 408. That is, the plaintiff did not demonstrate "that enforcing the Policy's choice of law provision would be 'unreasonable,' 'fundamentally unfair,' or 'contrary to a fundamental policy' of Louisiana." *Id.* at 409; *see also Singletary v. United Parcel Serv., Inc.*, 828 F.3d 342, 351 (5th Cir. 2016) (reaffirming the reasoning in *Jimenez*).

Here, Defendants have failed to meet their burden. First, Defendants did not identify another state's law (presumably Texas) that conflicts with Tennessee law. Instead, Defendants suggest that federal common law should apply to the assignment issue. Not so. Federal common law only applies in the absence of on point ERISA and non-preempted state-law provisions—which is not the case here as Tennessee law covers assignments. *See* 29 U.S.C. § 1144(b)(2)(A) (stating that ERISA was not intended to supersede state laws that regulate insurance); *see also Jimenez*, 486 F. App'x at 405–09 (applying Texas law when not preempted by ERISA); *La. Health Serv. & Indem. Co. v. Rapides Healthcare Sys.*, 461 F.3d 529, 530 (5th Cir. 2006) (not applying federal common law when a Louisiana statute

covered assignments). Second, to the extent Defendants argue that Tennessee law should not apply because Texas is the location where DSI treated H.S., the Fifth Circuit rejected that argument in *Jimenez* as insufficient to override a choice-of-law provision. Finally, CHS was responsible for including the choice-of-law provision in the CHS Plan, and it seems ironic that it now seeks to escape its effect.

### *(b) Preemption*

ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The Supreme Court has interpreted this provision to mean that ERISA preempts two categories of state laws—those that have "reference to" or those that have a "connection with" ERISA plans. *See Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943 (2016). A law refers to ERISA plans "[w]here [it] acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation." *Id.* (alteration in original) (quoting *Cal. Div. of Labor Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 325 (1997)). A law has a connection with an ERISA plan when that law "'governs . . . a central matter of plan administration' or 'interferes with nationally uniform plan administration.'" *Id.* (alteration in original) (quoting *Egelhoff v. Egelhoff*, 532 U.S. 141, 148 (2001)). Here, Defendants contend that Tennessee's assignment statute falls within the second category.

While the Fifth Circuit has never addressed Tennessee's assignment statute, it has held that ERISA does not preempt a similar Louisiana statute. In *Louisiana*

*Health Service*, Louisiana's assignment statute required insurance companies, employee benefit trusts, and self-insurance plans to pay benefits to hospitals when the itemized statement submitted indicates that the individual's rights to those benefits have been assigned to a hospital. 461 F.3d at 30–31. For two reasons, the court held that the statute did not "impermissibly interfere with nationally uniform plan administration." *Id.* at 540. First, it found that the burden on plan administrators would be minimal. *Id.* at 539. The assignment statute did not create additional obligations; it simply changed who the benefits flow to. *Id.* With or without assignment, plan administrators would only pay benefits one time. "It should not matter whether the claim form comes from the plan participant as provided in the plan documents, or from the hospital, as assignee of the participant's benefits claim." *Id.* Second, given the "intricacies of coverages, deductibles, and retentions of most health[]care plans," assignment lessens the burden on individual plan participants in the claims process. *Id.* Hospitals have institutional expertise in dealing with this process, and assignment allows them to use that knowledge to help the plan member and the plan administrators. *Id.*

Here, for the same reasons as in *Louisiana Health Service*, the Court finds that Tennessee's assignment statute does not govern a central matter of plan administration or interfere with uniform plan administration. It does not create additional obligations on the CHS Plan. The healthcare provider takes what the participant had—no more, no less. And it makes the administrative process easier by allowing the CHS Plan to deal with experienced healthcare providers instead of

16

individual participants. Under the statute, CHS remains free to forbid assignments to non-medical third parties who lack this expertise. TENN. CODE. § 57-7-120(a)(1) (providing that insurance contracts must allow for assignments to "healthcare providers," not to other third parties).

Recognizing *Louisiana Health Service*'s controlling strength, Defendants seek to weaken its pull by arguing that its framework was brushed aside by *Gobeille*, where the Supreme Court found that ERISA preempted a Vermont law. 136 S. Ct. at 947. Their argument is unconvincing. *Gobeille* did not modify the framework used in *Louisiana Health Service*. The results differed because the state laws touched different subjects. In *Gobeille*, Vermont required ERISA plans to report information about claims and plan members. *Id.* at 945. The Supreme Court found preemption necessary because ERISA has extensive reporting and disclosure requirements that are fundamental to its operation. *Id.* Differing, or even parallel, regulations touching upon recordkeeping, such as Vermont's reporting regime, intrude upon this crucial component of ERISA and subject ERISA plans to new and wide-ranging liability. *Id.* In contrast, the Tennessee statute does not intrude upon any fundamental part of ERISA because ERISA says precisely nothing about assignments. And unlike Vermont's requirements, the Tennessee statute does not expose plans to any additional liability.

Thus, the Court concludes that ERISA does not preempt Tennessee's assignment statute.

17

## (c) Tennessee's Assignment Statute Applies

Tennessee's assignment statute states:

> [W]henever any policy of insurance issued in this state provides for coverage of health care *rendered by a provider covered under title 63,* the insured or other persons entitled to benefits under the policy shall be entitled to assign these benefits to the *healthcare provider* and such rights must be stated clearly in the policy. *Notice of the assignment must be in writing to the insurer in order to be effective;* provided, however, such notice can be provided by other means if it is so stated in the policy.

TENN. CODE § 56-7-120(a)(1) (emphasis added). The Parties do not dispute that the CHS Plan is an insurance policy issued in Tennessee. CHS is the CHS Plan's sponsor and administrator. (Dkt. No. 75 at 61). CHS's headquarters and principal address are in Tennessee. (Dkt. No. 1 at 3). And the CHS Plan's service-of-process address is also in Tennessee. (Dkt. No. 75 at 62). The Parties do dispute, however, whether DSI is a provider covered under Title 63[4] and whether DSI gave adequate written notice of the assignment to Defendants.

Defendants argue that DSI is not covered under Title 63 because "DSI Laredo operates in Texas and therefore is not subject to Tennessee's licensing laws for medical practitioners found in Title 63." (Dkt. No. 79 at 35). Even if DSI Laredo were subject to Tennessee's licensing requirements, Defendants believe that it would be governed by Title 68, which covers licensing of renal-dialysis clinics, not Title 63. In response to Defendants' first contention, DSI notes that the statute does not require that the provider be *licensed* under Title 63, only that it be

---

[4] Title 63 applies to over 15 categories of persons engaged in the healing arts from nurses and massage therapists to optometrists and surgeons.

*covered*—meaning that it be within one of the approximately 15 categories of professions of the healing arts listed in Title 63. Regarding the second point, DSI argues that under Defendants' interpretation the assignment statute would not apply to any institutional providers (including general hospitals) because they are all governed by Title 68. This result, DSI contends, would be absurd.

Turning to the first argument, the Court agrees with DSI that Defendants' interpretation adds an additional element, i.e., licensing, to the statute that is not mentioned. The statute only requires that the provider be "*covered* by [T]itle 63." TENN. CODE § 56-7-120(a)(1) (emphasis added). The question is not whether Title 63's substantive licensing sections apply to the provider, but whether any individual provider falls within one of Title 63's categories of the healings arts. Put differently, the phrase serves as definitional shorthand in lieu of listing every type of provider that would trigger the statute's application.

Next, Defendants' argument that DSI is covered by Title 68 instead of Title 63 is true but immaterial. The Court agrees that Title 63 would not cover DSI because it only covers individual doctors, nurses, and other medical practitioners, whereas Title 68 regulates institutional providers such as DSI. But Defendants (and DSI for that matter) have forgotten that there was an individual at DSI who treated H.S., and it is that individual, not the facility where the treatment was rendered, that matters. One category of persons covered under Title 63 is "[a]ny person . . . who treats, or professes to diagnose, treat, operates on or prescribes for any physical ailment." *Id.* at § 63-6-204(a)(1). The person who administered the

19

dialysis treatment to H.S. for his end-stage renal disease at DSI Laredo falls within this category. Thus, the CHS Plan "provides for coverage of health[]care rendered by a provider covered under [T]itle 63." *Id.* at § 56-7-120(a)(1). This syllogism, which Defendants missed because they focused on the wrong actor, ends the argument in DSI's favor.

Defendants also complain that DSI never gave them written notice of the assignment. The evidence says otherwise. Every time DSI billed Defendants on the standard UB-04 form, it marked the Assignment of Benefits Certification Indicator (ASG BEN) in field 53 with a "yes." (Dkt. No. 85 at 3–4). Additionally, DSI sent multiple emails and letters to Defendants during the appeal process indicating that it was pursuing H.S.'s claims.[5] These bills, forms, and communications gave Defendants sufficient written notice to meet the statute's requirements.

### (d) Summary

In conclusion, the Court holds that Tennessee's assignment statute is not preempted by ERISA and governs the CHS Plan. The Court also holds that it applies in this case because H.S. received treatment from a person covered by Title 63 and because DSI gave written notice of the assignment. Thus, any language in the CHS Plan prohibiting assignments is void and cannot be used to thwart DSI's standing in this lawsuit.

---

[5] During the appeal process, MedPartners actually sent a letter to H.S. stating that it was aware that H.S. had signed an "'assignment of benefits' or a 'conditions of admission' document." (Dkt. No. 75-4 at 18).

### (2) Ambiguity

Even if Tennessee's assignment statute did not apply, the CHS Plan's anti-assignment provision would still not invalidate DSI's assignment because it is ambiguous and must, therefore, be construed against Defendants.

The CHS Plan's anti-assignment provision reads:

*Assignments*

> No Covered Person shall have the right to assign, alienate, transfer, sell, hypothecate, mortgage, encumber, pledge, commute, or anticipate any benefit payment under the Plan to a third party, and such payment shall not be subject to any legal process to levy execution upon or attachment or garnishment proceedings against for the payment of any claims. Benefit payments under the Plan may not be assigned, transferred, or in any way made over to another party by a Covered Person. Nothing contained in this Plan shall be construed to make the Plan or the Plan Sponsor liable to any third party to whom a Covered Person may be liable for medical care, treatment, or services. If authorized in writing by a Covered Person, the Plan Administrator may pay a benefit directly to a provider of medical care, treatment, or services instead of the Covered Person as a convenience to the Covered Person; when this is done, all of the Plan's obligation to the Covered Person with respect to such benefit shall be discharged by such payment. However, the Plan reserves the right to not honor any assignment to any third party, including but not limited to, any provider. The foregoing does not preclude any assignment of payment to Medicaid to the extent required by law. The Plan will not honor claims for benefits brought by a third-party; such third-party shall not have standing to bring any such claim either independently, as a Covered Person or beneficiary, or derivatively, as an assignee of a Covered Person or beneficiary.

(Dkt. No. 75 at 60). In interpreting an ERISA plan, courts must read "its provisions not in isolation, but as a whole," and according to their plain meaning. *Dall. Cty. Hosp. Dist. v. Assocs.' Health & Welfare Plan,* 293 F.3d 282, 288 (5th Cir. 2002). Any ambiguities are resolved against the plan. *Id.* In other words, courts interpret

ERISA plan provisions "as they are likely to be 'understood by the average plan participant.'" *Walker v. Wal-Mart Stores, Inc.*, 159 F.3d 938, 940 (5th Cir. 1998).

DSI and Defendants trot out different cases that they contend are on point and resolve the ambiguity issue in their favor. DSI points to *Dallas County* where the Fifth Circuit upheld an assignment to a network provider because of the plan's ambiguity. 282 F.3d at 289. On the one hand, the plan contained broad sweeping language forbidding assignments and allowed the plan to dishonor any assignments. *Id.* at 288. But on the other hand, it also allowed for assignments to network providers and for participants to authorize direct payment of benefits to a provider. *Id.* The court construed these contradictions against the plan and held that the provision allowing for network-provider assignments controlled. *Id.* at 289.

Defendants rely on *LeTourneau Lifelike Orthotics v. Wal-Mart Stores, Inc.*, 298 F.3d 348 (5th Cir. 2002). There, the plan had two sections that unambiguously prohibited assignment. One stated that Wal-Mart would not be "liable to any third-party to whom a participant may be liable for medical care, treatment, or service." *Id.* at 349. The other stated that "[e]xcept as permitted by the Plan or as required by state Medicaid law, no attempted assignment of benefits will be recognized by the Plan." *Id.* at 350. Because "this language is unquestionably directed at providers of health[]care services," the court held that LeTourneau's assignment was void. *Id.* at 251.

At first glance, *LeTourneau* seems to support Defendants' position. Both plans contain the same language stating that it will not be liable to suit by third

22

parties for medical care. Because this language led the *LeTourneau* court to conclude that the provider did not have derivative standing, Defendants argue that this Court must conclude the same here. Defendants, however, miss one key point.

In *LeTourneau*, the participant signed LeTourneau's entry form that permitted Wal-Mart to pay LeTourneau "all things to which [the participant] was 'entitled' under the Plan." *Id.* at 349–350. The plan—as an exception to the general anti-assignment rule—allowed participants to authorize direct prepayment to providers for *covered* services. *Id.* at 350 n.2. Unfortunately for LeTourneau, the plan did not cover the prosthetic leg that it provided to the participant. Had it been covered, the court recognized that LeTourneau would have been entitled to payment. *See id.* at 352 ("[T]he contents of the entry form signed by [the participant] . . . did effectively assign to [LeTourneau] her right to receive payments for duly *covered* claims."). In other words, "the dispute was over th[e] plan's coverage of the services rendered. Because the services rendered in [*LeTourneau*] were not covered by the plan in the first place, the provider lacked standing." *Harris Methodist Fort Worth v. Sales Support Servs. Inc.*, 426 F.3d 330, 336 n.4 (5th Cir. 2005) (describing *LeTourneau*'s holding). In light of this nuance, *LeTourneau*'s strength for Defendants' position flounders because this case is about ambiguity in the CHS Plan, not about coverage. Indeed, there is no dispute that the CHS Plan covered H.S.'s treatments.

Rather, *Dallas County* controls the outcome of this issue. Like in *Dallas County*, the CHS Plan's anti-assignment clause contains broad language prohibiting

23

assignments. Yet on equally plain terms, it allows for participants to authorize direct payment to providers, which, as the Court has already explained, necessarily includes the right to sue for unpaid benefits. Just as the Fifth Circuit did with the network-assignment clause in *Dallas County*, the Court will interpret the CHS Plan's direct-payment clause to mean what it says. Insofar as it conflicts with the sentences prohibiting assignments, this ambiguity is construed against the CHS Plan. Also, the CHS Plan's reservation of the right to dishonor any assignments does not change this determination. The same clause was present in *Dallas County*, and the court still upheld the assignment. 293 F.3d at 287.

One last point, ERISA is silent on assignments. As such, the assignability of benefits is left to the free negotiation of the parties. *Id.* at 287. But because enforcing an anti-assignment clause against a provider would seriously undermine ERISA's goal of enhancing healthcare,[6] the Court will not interpret the seven convoluted and conflicting sentences in the anti-assignment provision to invalidate DSI's assignment. If CHS wanted to prohibit assignments, it should have done so in plain English, understandable to the average plan participant.

---

[6] *See Hermann I*, 845 F.2d at 1289 n.13 ("To deny standing to health[]care providers as assignees of beneficiaries of ERISA plans might undermine Congress'[s] goal of enhancing employees' health and welfare benefit coverage. Many providers seek assignments of benefits to avoid billing the beneficiary directly and upsetting his finances and to reduce the risk of non-payment. If their status as assignees does not entitle them to federal standing against the plan, providers would either have to rely on the beneficiary to maintain an ERISA suit, or they would have to sue the beneficiary. Either alternative, indirect and uncertain as they are, would discourage providers from becoming assignees and possibly from helping beneficiaries who were unable to pay them 'up-front.' The providers are better situated and financed to pursue an action for benefits owed for their services. Allowing assignees of beneficiaries to sue under § 1132(a) comports with the principle of subrogation generally applied in the law.").

### 3. Exhaustion

The final procedural issue for the Court to tackle is whether DSI exhausted its administrative remedies before filing suit. In general, "claimants seeking benefits from an ERISA plan must first exhaust available administrative remedies under the plan before bringing suit to recover benefits." *Bourgeois v. Pension Plan for Emps. of Santa Fe Int'l Corp.*, 215 F.3d 475, 479 (5th Cir. 2000). However, when the administrator fails to follow claims procedures consistent with the regulatory requirements, "a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any remedies under section 502(a) of [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." 29 C.F.R. § 2560.503-1(I)(1). Administrators need only "substantially comply" with the relevant regulations, and substantial compliance is a question of law. *Baptist Mem'l Hosp.-DeSoto Inc. v. Crain Auto. Inc.*, 392 F. App'x 288, 293 (5th Cir. 2010) (per curiam).

Under 29 C.R.F. § 2560.503-1, plan administrators need to follow numerous requirements, two of which are relevant here. First, when denying a claim, an administrator must include "a description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under [ERISA]." 29 C.F.R. § 2560.503-1(g)(1)(iv). Second, in the appeal process, the administrator must ensure that the person reviewing the claim was not "the individual who made the adverse benefit

25

determination." *Id.* at § 2560.503-1(h)(3)(ii).

Here, Defendants did not comply with these requirements. Defendants sent 38 notice-of-benefit-denial letters to DSI, none of which informed DSI that it had a right to a second appeal, the relevant time frame for such an appeal, and that DSI had a right to bring an ERISA action. (*See* Dkt. No. 75-3 at 3–87). Twelve of those letters contained no description whatsoever about the CHS Plan's review procedures. (*Id.*) And the 26 letters that did manage to state that DSI had a right to a first appeal did not describe the correct procedure for doing so. (*Id.*). They state that the first appeal should be submitted to the plan administrator (*Id.* at 14) while the CHS Plan states that the first appeal will be handled by the TPA and not the plan administrator. (Dkt. No. 75 at 40). Finally, once DSI submitted its first-level appeals, the same person that initially denied DSI's claims also reviewed the appeal. (*See* Dkt. No. 75-4 at 81–2, 84).

This evidence demonstrates that Defendants were not in substantial compliance with the relevant regulations and did not provide reasonable claims procedures. Thus, DSI is deemed to have exhausted its administrative remedies.

Alternatively, DSI is also excused from the exhaustion requirement under the futility exception. *Bourgeois*, 215 F.3d at 479. DSI did timely file a first and second appeal for 18 claims.[7] And all of the claims centered on the same recurring and

---

[7] On June 12, 2014, DSI sent a letter to the CHS review committee asking for a final review, which CHS never replied too. (Dkt. No. 75-4 at 91–92). Defendants argue that this letter is insufficient as a second-level appeal because it does not specify which claims it is appealing. The Court disagrees. First, Defendants did not inform DSI as to what information is required in the appeal, and second, the CHS Plan does not specify that claim numbers need to be included.

fundamental disagreement with the Defendants over their interpretation of the UCR provision. Thus, there was no need for DSI to exhaust the rest of its claims as the result would have been the same. *See N. Cypress Med. Ctr. Operating Co. v. Principal Life Ins. Co.*, No. H-09-2185, 2012 WL 434043, at *5 (S.D. Tex. Feb. 9, 2012) (excusing exhaustion requirement on futility grounds because all 106 claims involved the same dispute and because, "[a]lthough the plaintiffs did not exhaust their administrative remedies on each individual claim, they did try to do so on numerous claims").

## B. Substantive Challenge to Denial of Benefits

With the procedural hurdles resolved in DSI's favor, the Court can now address whether Defendants abused their discretion when they interpreted the UCR provision to incorporate Medicare rates.

Because the CHS Plan vests Defendants with discretionary authority to determine eligibility for benefits, the Court reviews their denial of benefits for abuse of discretion. *See Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 651–52 (5th Cir. 2009). The Fifth Circuit has developed a two-step analysis to determine whether a plan administrator abused its discretion. First, a court must ascertain if an administrator's interpretation of an ERISA plan was legally correct, and second, it must determine whether the administrator's decision was an abuse of discretion. *Gosselink v. Am. Tel. & Tel., Inc.*, 272 F.3d 722, 726 (5th Cir. 2001). In answering the first question, courts consider three factors: "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent

with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan." *LifeCare*, 703 F.3d at 841.

Of the three factors, the second is preeminent. "An administrator's interpretation is consistent with a fair reading of the plan if it construes the plan according to the 'plain meaning of the plan language.'" *Id.* (quoting *Threadgill v. Prudential Sec. Grp., Inc.*, 145 F.3d 286, 292 (5th Cir. 1998)). In other words, an ERISA plan must be interpreted as it likely to be "understood by the average plan participant, consistent with the statutory language." *Crowell v. Shell Oil Co.*, 541 F.3d 295, 314 (5th Cir. 2008).

If a court finds that an administrator interpreted a plan incorrectly, then it must consider whether the administrator abused its discretion. Factors relevant to this second determination include: "(1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith." *LifeCare*, 703 F.3d at 841 (quoting *Gosselink*, 272 F.3d at 726). Yet, "if an administrator interprets an ERISA plan in a manner that directly contradicts the plain meaning of the plan language, the administrator has abused [its] discretion even if there is neither evidence of bad faith nor a violation of any relevant administrative regulation." *Id.*

### 1. Legal Correctness

Many of Defendants' initial denial letters begin by reciting the CHS Plan's UCR definition, which reads:

> *Usual Charge* means the amount ordinarily charged by a provider for any given service, and *Customary Charge* means a charge that falls within the range of the Usual Charges for any given service within the geographic area in which the service is rendered.

(Dkt. No. 75 at 57). The letters then continue: "[t]o determine the usual charge, many factors are considered, including the amount providers typically accept as payment from *all* payors, the Medicare allowable for that specific service, the opinion of experts, prior claims experience and the amounts typically paid by other commercial payors." (Dkt. No. 75-3 at 3). Ultimately, they conclude that the UCR for dialysis treatment is 200% of the Medicare rate. (*Id.* at 4). In the appeal process, Defendants clung to their use of Medicare rates to determine the UCR. (Dkt. No. 75-4 at 81–82, 84). The February 18 denial letter reaffirms that a customary charge is what "providers typically accept as payment from all payors, which is on average 200% of the US ESRD Medicare allowable." (*Id.* at 84).

Defendants' interpretation of the UCR provision contradicts its plain meaning. The provision is straightforward. It directs the plan administrator to answer two questions: (1) is the charge what the provider ordinarily bills for the given service, and (2) does that charge fall within the range of charges that other providers in the geographic area bill for the same service. Despite its clarity, Defendants ignored these two questions and instead plucked three new factors out of thin air. The provision does not mention what providers accept from other payors, amounts typically paid by other payors, or the use of Medicare rates. These factors have no plausible connection to the UCR provision's ordinary meaning, and an average person would not understand it to include this complicated three-factor

29

analysis—especially the complex method that is used to determine Medicare rates. As such, Defendants' interpretation of the UCR provision was legally incorrect.

Seeking to refute this conclusion, Defendants cite to numerous cases that have upheld a plan administrator's use of Medicare data in calculating the UCR. In all of the cases cited, however, the plans explicitly allowed the plan administrators to take into account Medicare rates or gave the administrators discretion to consider different factors.[8] Far from supporting Defendants, these cases stand for the proposition that courts enforce ERISA plans as they are written. And while it is true that many ERISA plans allow administrators to look at various factors, including Medicare, to determine a customary or reasonable charge, the CHS Plan's UCR provision does not. That is, the provision does not specify Medicare data as a factor to consider, nor does it contain a reasonableness prong—or otherwise confer any discretion—that would allow Defendants to consider other factors like Medicare.

### 2. Abuse of Discretion

In this case, the abuse-of-discretion analysis tracks the legally-correct

---

[8] *See Krauss v. Oxford Health Plans,* 517 F.3d 614, 623 (2d Cir. 2008) (plan provided that the UCR is either "[t]he amount charged or the amount We [sic] determine to be the reasonable charge, whichever is less"); *Lefler v. United Healthcare, Inc.,* 72 F. App'x. 818, 821 n.16 (10th Cir. 2003) (definition of "reasonable and customary charges" was determined "in PLAN's judgment"); *Hickman v. GEM Ins. Co.,* 299 F.3d 1208, 1210 (10th Cir. 2002) (plan defines "Usual and Customary" as prevailing charge "as determined by the Company"); *Romano Woods Dialysis Ctr. v. Admiral Linen Serv.,* 2015 WL 4393027, *4 (S.D. Tex. June 30, 2015) ("[T]he Plan provides that the Plan Administrator may, in its discretion, determine and establish the amount of 'Usual and Customary charges' by using 'normative data such as . . . Medicare cost to charge ratios.'"); *Fresenuis Medical Care Holdings, Inc. v. Brooks Food Group, Inc.,* 2008 WL 2679187, *1–2 (W.D.N.C. June 26, 2008) (plan provided that the plan administrator has "discretionary authority to decide whether a charge is usual and reasonable" by, among other things, "considering the amounts allowed by Medicare for each service").

analysis because Defendants interpreted the CHS Plan in a manner that directly contradicts its plain meaning. So the Court need not consider any of the other abuse-of-discretion factors. *See LifeCare*, 703 F.3d at 841. As discussed above, Defendants did not follow the CHS Plan's methodology for determining the UCR. As such, Defendants abused their discretion when they denied DSI's benefits claims on the basis of this erroneous interpretation.

## B. Remand

Having concluded that Defendants have abused their discretion by interpreting the UCR provision incorrectly, the Court must now determine whether to enter judgment and award benefits to DSI or remand to CHS for further factual determinations.

Remand is appropriate when the administrator has not had the opportunity to consider the issue in dispute. In *Schadler v. Anthem Life Ins. Co*, the Fifth Circuit remanded the case back to the plan administrator to determine whether a policy exclusion that the administrator had not considered provided an alternative basis for denying coverage. 147 F.3d 388, 398 (5th Cir. 1998). The court believed that remand was proper because it is the job of a district court to "*review* the administrator's fact-finding and its interpretation of an employee benefit plan's provisions." *Id.* at 397. A district court may not make initial benefits determinations itself. *Id.* at 398. "[I]t is not the court's function *ab initio* to apply the correct standard to [the participant's] claim. That function, under the Plan, is reserved to the Plan administrator." *Id.* (alterations to original) (quoting *Saffle v.*

*Sierra Pac. Power Co.*, 85 F.3d 455, 461 (9th Cir. 1995)); *see also Roig v. Ltd. Long–Term Disability Program*, 275 F.3d 45, 2001 WL 1267475, at *4 (5th Cir. Oct. 9, 2001) (unpublished) (remanding to the administrator to determine long-term-disability benefits because the administrator had not yet passed upon the issue).

Yet a "court may [also], upon finding an abuse of discretion on the part of the administrator, award the amount due on the claim and attorney's fees." *Vega v. Nation Life Ins. Services, Inc.*, 188 F.3d 287, 302 (5th Cir. 1999), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). Doing so is proper when the parties have already developed the factual record on the dispositive issue at the administrative level and that record contains "no concrete evidence" to support the administrator's decision. *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 397 n.5 (5th Cir. 2006).

For example, in *Vega*, the administrator concluded that Vega made a material misrepresentation in his answer to a medical questionnaire. 188 F.3d at 301. The court held that this was an abuse of discretion because there was simply no competent evidence in the record showing that Vega's misrepresentation was material. *Id.* The court "decline[d] to remand to the administrator to allow him to make a more complete record" on the material-misrepresentation issue. *Id.* at 302 n.13. The administrator had already had the chance to develop the record on this point, and it would be unfair to give him a second opportunity to do so. *Id.*

In this case, the Court concludes that the appropriate action is to remand DSI's claims back to CHS because additional factual determinations need to be

made. Due to Defendants' persistent, incorrect interpretation of the UCR provision, they did not consider whether DSI's charge was its usual charge for dialysis treatments and was within the range of what other dialysis clinics in the relevant geographic area charge for the same service. As a result, the administrative record contains no evidence on this issue. DSI has now submitted some evidence in its summary-judgment briefing demonstrating that its charge is usual and customary. But the Court cannot consider it, for it "would stand ERISA on its head" if a district court were to make factual and legal inquiries in the first instance. *Schadler*, 147 F.3d at 388. Doing so would decide, not review, an initial benefits determination— exactly what *Schadler* forbids. CHS must be given the first opportunity to apply the CHS Plan, properly construed, to DSI's claims.

Moreover, this case is unlike *Vega* for two reasons. First, remand will not give Defendants a second opportunity to develop the record on the dispositive issue because it was never addressed at the administrative level. Defendants' misinterpreted the CHS Plan, and this led them to consider a completely irrelevant issue, i.e., whether DSI's charge exceeded 200% of the Medicare rate. Second, the only dispute in *Vega* was whether a material misrepresentation was made. There was no debate over the meaning of the plan; only a debate over the administrator's application of it to the facts. Whereas here, the Parties are primarily fighting over the UCR's meaning, not over its application.

Numerous other circuits have also concluded that district courts should remand back to plan administrators to apply ERISA plans, properly construed, in

the first instance.[9]  These cases are consistent with the underlying reasoning driving the Fifth Circuit's decision in *Schadler*.  Indeed, district courts in this circuit have already relied on *Schadler* to conclude that remand is proper when the administrator misinterprets an ERISA plan.  *See  Collinsworth v. AIG Life Ins. Co.*, 404 F. Supp. 2d 911, 923 (N.D. Tex. 2005) (Lynn, J.) (remanding because the administrator's analysis "was based on an erroneous interpretation of the benefit plan" and because "additional factual determinations need to be made to determine if [p]laintiff qualifies for benefits"); *Khan v. Am. Int'l Grp., Inc.*, 654 F. Supp. 2d 617, 633 (S.D. Tex. 2009) (Rosenthal, J.) ("Remand is also appropriate when, as here, the Plan Administrator's failure to consider a critical benefits issue results from a legally incorrect Plan interpretation.").

Thus, because Defendants interpreted the UCR provision incorrectly and because neither Party developed the relevant facts at the administrative level, the Court remands DSI's claims to CHS to evaluate them under the correct definition of a "usual and customary charge," as defined by the CHS Plan and in accordance with

---

[9] *See Saffle*, 85 F.3d at 461 ("[W]hen, as here, the administrator construes a plan provision erroneously, the court should not itself decide whether benefits should be awarded but rather should remand to the administrator for it to make that decision under the plan, properly construed."); *Barlow v. Sun Life & Health Ins. Co.*, 488 F. App'x 458, 459 (11th Cir. 2012) ("Where an administrator applies or uses an incorrect definition of an ERISA plan term[,] the proper course is generally to remand the matter to the administrator."); *King v. Hartford Life & Acc. Ins. Co.*, 414 F.3d 994, 1005–06 (8th Cir. 2005) (noting that when the plan administrator applies an incorrect definition, the proper remedy is to remand the case to the administrator for re-evaluation of the claim under the correct definition); *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 665 (6th Cir.2004) ("Because application of the correct definition of accident and the ultimate resolution of Jones's claim requires additional findings of fact, we will remand this case to MetLife."); *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (holding that a court should remand, even after determining that the administrator abused its discretion, if the court would need to consider evidence not in the administrative record).

this opinion.

## II. Conclusion

For the forgoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** DSI's Motion for Summary Judgment (Dkt. No. 61) and **DENIES** CHS's and MedPartners's Motions for Summary Judgment (Dkt. Nos. 73, 77, 78). All Motions dealing with filing additional pages, supplementing the record, or filing sur-replies (Dkt. Nos. 70, 73, 80, 84, 89, 92, 103) are **GRANTED**. All other pending Motions (Dkt. Nos. 81, 97) are **DENIED.**

DSI's claims are **REMANDED** to CHS for further adjudication consistent with this opinion. The Court will retain jurisdiction over this case. CHS is **ORDERED** to determine DSI's claims within 120 days and notify the Court of the result. Should DSI still wish to challenge CHS's determination, it can file a motion doing so at that time.

It is so **ORDERED.**

**SIGNED** June 14, 2017.

Marina Garcia Marmolejo
United States District Judge